1  RUTAN & TUCKER, LLP
   Douglas J. Dennington (State Bar No. 173447)
2  ddennington@rutan.com
   Alisha Patterson (State Bar No. 274630)
3  apatterson@rutan.com
   611 Anton Boulevard, Suite 1400
4  Costa Mesa, California 92626-1931
   Telephone:  714-641-5100
5  Facsimile:   714-546-9035

6  Attorneys for Defendant
   CITY OF TORRANCE

7

JS-6

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  (WESTERN DIVISION)

11  KATIE BASSILIOS,                  Case No. 14-cv-03059-AB-JEMx

12            Plaintiff,              HONORABLE ANDRE BIROTTE, JR.
                                      COURTROOM 4
13       vs.
                                      **JUDGMENT ON JURY VERDICT
14  CITY OF TORRANCE, CA,             AND PERMANENT INJUNCTION**

15            Defendant.

16                                    Date Action Filed:  April 21, 2014
                                      Trial Date:          January 26, 2016
17

18         On December 4, 2015, the Court issued an order granting Plaintiff Katie

19  Bassilios's ("Plaintiff") motion for partial summary judgment (Dkt. No. 76, referred

20  to herein as the "Summary Judgment Order"), finding that the City of Torrance

21  ("City") violated Title II of the Americans with Disabilities Act (the "ADA"),

22  Section 504 of the Rehabilitation Act ("Section 504"), and California Government

23  Code §11135 when it denied Plaintiff's request for a designated handicapped

24  parking space on the street in front of her apartment.  The basis for the Court's

25  ruling is as stated in the Summary Judgment Order, which is attached hereto as

26  Exhibit "A," incorporated into this Judgment as though set forth herein in full.

27  / / /

28

On December 22, 2016, the Court issued an order granting in part and denying in part Plaintiff's motion for injunctive relief (Dkt. No. 145, referred to herein as the "Injunction Order").  The Injunction Order is attached hereto as Exhibit "B," incorporated into this Judgment as though set forth herein in full.

This action came on regularly for a jury trial on damages on January 26, 2016 in Courtroom 4 of the United States District Court, Central District of California (Western Division), the Honorable André Birotte Jr., judge presiding.  Autumn Elliott and Dara Schur of Disability Rights California appeared as attorneys of record for Plaintiff, and Douglas Dennington and Alisha Patterson of Rutan & Tucker, LLP appeared as attorneys of record for the City.  A jury of eight (8) persons was regularly impaneled and sworn, but one juror was excused after the first day of trial due to illness.  Witnesses were sworn and testified.

After presenting evidence, both parties moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.  The Court denied both parties' motions, which denials are documented in the "Civil Minutes – Trial" for January 28, 2016 (Dkt. No. 158) attached hereto as Exhibit "C," incorporated into this Judgment as though set forth herein in full.

After hearing the evidence and arguments of counsel, the jury was duly instructed by the Court.  On January 28, 2016, the cause was submitted to the jury with directions to return a verdict on Plaintiff's claim for damages under the ADA and Section 504.  The jury deliberated and thereafter returned into the Court with its unanimous verdict for the City as set forth in the Special Verdict Form (Dkt. No. 159) attached hereto as Exhibit "D," incorporated into this Judgment as though set forth herein in full.

/ / /

/ / /

/ / /

/ / /

1    Pursuant to that Special Verdict Form, **IT IS HEREBY ORDERED,**
2  **ADJUDGED AND DECREED that** Plaintiff shall take nothing by way of
3  damages from the City.

4

5    IT IS SO ORDERED AND DECREED.

6

7

8  Dated: March 4, 2016    _____

9    HONORABLE ANDRÉ BIROTTE JR.
   U.S. DISTRICT COURT JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATIE BASSILIOS, | Case No. CV 14-03059-AB (JEMx) |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF TORRANCE, CA | |
| Defendants. | |

Plaintiff Kate Bassilios ("Plaintiff") filed this action seeking relief from the Defendant the City of Torrance's ("City") denial of her request that it designate a disabled parking space on the street in front of her apartment. *See* First Amended Complaint ("FAC," Dkt. No. 8) ¶¶ 1, 2.  Plaintiff contends that by denying her request, the City discriminated against her on the basis of her disability in violation of Title II of the Americans with Disabilities Act (the "ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504" or the "RA"), and California Government Code § 11135 ("Section 11135").  FAC ¶ 3.  Plaintiff also contends that the City has a general policy of denying such requests, and that this policy violates the ADA, RA, and Section 11135.  FAC ¶¶ 2, 28.  Plaintiff seeks declaratory and injunctive relief requiring the City to grant her request and to change its policy; she also seeks

Exhibit A, page 4

damages and costs.  *See* FAC ¶ 62.

Now before the Court is Plaintiff's motion for summary judgment or partial summary judgment.  (Dkt. No. 41.)  The City filed an opposition in which it also seeks summary judgment (Dkt. No. 48), and Plaintiff filed a reply.  (Dkt. No. 53.)  A hearing was held on September 28, 2015.  *See* MSJ Tr. (Dkt. No. 74.)  Having considered the materials and argument submitted by counsel, the Court **GRANTS** Plaintiff's motion and **DENIES** the City's motion.

## I. UNDISPUTED FACTS

The following material facts are not genuinely disputed.[1]

### A. Plaintiff's Disability and Request for a Modification

Plaintiff lives in an apartment on Calle Miramar in the City of Torrance.  (PSUF 15, 16.)  Plaintiff has physical impairments including cerebral palsy and a pin in her foot, and as a result, has difficulty walking distances greater than 50 feet, walking up and down stairs, walking up and down sloped surfaces, and walking on uneven ground.  (PSUF 19, 20.)   Plaintiff has a disabled person parking placard issued by the State of California.  (PSUF 21.)  Plaintiff works as a behavioral therapist and uses her car to commute to work, run errands, and generally to access the community beyond her home.  (PSUF 18.)

---

[1] The undisputed facts are taken from Plaintiff's Statement of Undisputed Facts ("PSUF") and the City's Response ("RSUF") thereto.  (Dkt. Nos. 41-2, 49.)  The City purports to "dispute" many facts, but a review of the underlying evidence makes it clear that many of the claimed disputes are illusory.  The court will treat such facts as undisputed without further explanation.  The parties also filed evidentiary objections.  (Dkt. Nos. 50, 54, 55, 58, 61, 62, 66-69.)   To the extent those objections are inconsistent with the court's ruling, they are overruled.  All other objections are sustained.

The Court also **GRANTS** both parties' unopposed Requests for Judicial Notice.  (Dkt. Nos. 41-3, 51, 59.)  The parties seek judicial notice of Article 6 of the Torrance Municipal Code, sections of the California Vehicle Code and Streets and Highways Code, various ADA compliance guidelines, a Caltrans highway map, a map generated using Google, and a section of the City of Torrance's General Plan.  These materials are judicially noticeable under Fed. R. Evid. 201.  The Court will more specifically identify these materials as necessary in the body of the order.

Exhibit A, page 5

Plaintiff has an assigned parking space in the garage at the rear of her apartment building, but she has never used it because she has difficulty accessing it.  One route from the garage space to Plaintiff's front door is 100 feet long and includes one flight of stairs, and the other route is 240 feet long, includes an extended driveway, and has a running slope of 6%.  (PSUF 24, 25.)

Instead of parking in her space in the garage, Plaintiff parks on the street in front of her home or in the surrounding neighborhood.  (PSUF 26.)  The route from the curb directly in front of Plaintiff's apartment building to the front door of her apartment is approximately 50 feet long and has a slope of 5%.  (PSUF 28.)  This route is shorter than either of the two routes from Plaintiff's garage parking space to her front door, and has fewer obstacles for Plaintiff to surmount.  (PSUF 29.)

When the parking space in front of Plaintiff's apartment is not available, she looks for parking elsewhere along the street or in the neighborhood, or calls her husband to park the car for her.  (PSUF 30.)  The area between the curb and the residences along Calle Miramar – the area where a sidewalk might be – is narrow and the terrain is sloped, uneven, and unpaved in some places.  (PSUF 31.)  The farther away from her apartment that Plaintiff must park, the longer she must walk along this terrain.  (PSUF 32.)  Because of these parking difficulties, Plaintiff, through counsel, asked the City to designate the parking space in front of her apartment building as handicapped parking by painting the curb blue.[2]  (PSUF 36.)

### B.     The City's Response to Plaintiff's Request

State law allows municipalities to designate parking for the exclusive use of people with disabilities who have a disabled parking placard.  (PSUF 33; Cal. Veh. Code § 22511.7(a).)  State law provides that when "a local authority so designates a parking space, it shall be indicated by blue paint on the curb or edge of the paved portion of the street adjacent to the space.  In addition, the local authority shall post

---

[2]   The Court will refer to this as a "blue curb parking space" or "blue curb space."

Exhibit A, page 6

1   immediately adjacent to and visible from the space a sign consisting of a profile view
2   of a wheelchair with occupant in white on a blue background." (PSUF 34; Cal. Veh.
3   Code § 22511.7(b)(1).)

4        The Torrance Municipal Code authorizes the City's Traffic Engineer to place
5   curb markings to indicate parking or standing restrictions. Under the Municipal Code,
6   blue curb markings "mean parking limited exclusively to the vehicles of physically
7   handicapped persons displaying specified distinguishing license plates." (PSUF 35;
8   Torrance Muni. Code § 61.6.15(e) (Pl.'s RJN Exh. A).)

9        The cost of painting the curb blue and installing signage to designate a curbside
10  parking space for people with disabled parking placards is roughly $2,205. (PSUF
11  63.)

12       The City understood that Plaintiff asked it to designate a blue curb parking
13  space in front of her apartment because she has a disability. (PSUF 37.) The City did
14  not seek to verify Plaintiff's disability, and for the purpose of responding to her
15  request, assumed she had a disability and that she would benefit if the City granted her
16  request. (PSUF 38, 39.)

17       As a general policy, the City does not designate handicapped parking spaces on
18  public streets. (PSUF 73.)[3] The City has denied all requests to designate any blue
19  curb parking spaces in residential areas since at least 1999, and there are no such
20  spaces in the entire City. (PSUF 70, 71.) Consistent with its policy, the City denied
21  Plaintiff's request to designate a blue curb parking space. (PSFU 73.) Instead, the
22  City painted the space in front of Plaintiff's apartment green, which establishes a 20-
23  minute parking limit between 8:00 a.m. and 6 p.m. every day except Sunday and legal
24  holidays. (PSUF 40.) However, green curb parking spaces are unrestricted on

25  _____

26  [3] At oral argument, the City's counsel stated that the City's policy of denying requests
    for handicapped parking spaces includes an exception if a person can demonstrate an
27  overriding need. *See* MSJ Tr. 22:21-23:10. However, the City's brief failed to
    mention any such exception, and the City did not point to any evidence substantiating
28  its existence. Thus, for purposes of this motion, there is no such exception.

4.

Sundays, legal holidays, and all other days between 6:00 p.m. and 8:00 a.m.  (PSUF 56.)  Although the 20-minute parking limit does not apply to cars displaying disabled parking placards, a green curb space is not reserved for people with disabled parking placards.  (PSUF 55.)  During the times that the 20-minute parking limit applies, the green curb space is often occupied by vehicles without a disabled parking placard.  (PSUF 60.)

Plaintiff is at work most of the day (typically, until 3:30 p.m.).  (PSUF 58.)  Plaintiff notified the City a number of times that the green curb parking space was not an effective modification for her disability and that she needed the City to designate a parking space for people with disabilities.  (PSUF 61.)  However, the City has not made any other modifications.

### C.    The City's Involvement in On-Street Parking

The City of Torrance maintains and controls the roadway in front of Plaintiff's home.  (PSFU 10.)  The Torrance Municipal Code authorizes the City to control curbside parking in numerous ways.  *See generally* Torrance Muni. Code, Article 6, Stopping, Standing, and Parking (Pl.'s RJN Exh. A).  Under the Code, the City Traffic Engineer can designate that the stopping, standing, or parking of vehicles on any street is limited or prohibited.  *Id.* § 61.6.1.

The City has the authority to regulate curbside parking by painting the curb and posting signs explaining parking rules.  For example, City has posted signs prohibiting parking during street-sweeping hours and warning that vehicles parked in violation of this rule will be towed.  *See* MSJ Tr. 37:10-21.  The City also prohibits parking in excess of specific durations or for specific purposes, and establishes how vehicles should be parked.  *See, e.g., id.* § 61.6.4 (no parking in excess of 72 consecutive hours), § 61.6.5 (no parking to display a vehicle for sale or to wash or repair a vehicle), § 61.6.6 (vehicle must be parked no more than 18 inches from left-hand curb).  The City can tow "[a]ny vehicle which has been parked or left standing upon any street of highway for seventy-two (72) hours."  *Id.* § 61.6.3(a).  The City also

5.

employs parking enforcement officers who monitor parking along areas under its control, including Calle Miramar.  (PSUF 7.)

With respect to street maintenance, the City has the authority to reseal the asphalt on Calle Miramar, and in fact completed a slurry seal project on Calle Miramar several years ago. (PSUF 11.)  The City also refreshes the paint on the curb in front of Plaintiff's home when it becomes faded or otherwise needs refreshing. (PSUF 5.)

### D.     The City's Receives Federal and State Funding

The City "is a municipal corporation organized under the laws of the State of California."  (PSUF 75.)

The City has received federal funding, including Community Development Block Grant ("CDBG") funding, since at least 2011.  (PSUF 76, 77.)  The City's Department of Public Works receives federal funding, including CDBG funds, and uses it for streets, sidewalks, and curbs, including to make streets, sidewalks, and curbs more accessible for disabled persons.  (PSUF 82, 84, 86.)

The City, including its Department of Public Works, receives state funds and has used those funds for street rehabilitation.  (PSUF 88, 89, 90.)

## II.     LEGAL STANDARD

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's

6.

case. *Id.* The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

## III.   DISCUSSION

Plaintiff's motion seeks only a determination that the City violated Section 504 of the RA, Title II of ADA,[4] and Gov. Code § 11135 by failing to provide her equal access to on-street parking and denying her a reasonable modification. Plaintiff does not expressly seek damages or a broader determination that the City's policies and practices violate these statutes.

### A.   The Purpose of the ADA and the RA

The ADA and the RA have overlapping objectives and are construed in the same way. *Compare* 29 U.S.C.A. § 701(b) (purpose of the RA includes "to empower

---

[4]   The City's objection that Plaintiff failed to allege a program access claim is without merit. *See* First Amended Complaint ("FAC") 7:20-27 (the City violated the ADA by "[d]enying Ms. Bassilios' request for an accessible parking space as a reasonable modification for her disability [and] [d]enying Ms. Bassilios *meaningful access to Defendant Torrance's street parking program* by excluding her based on her disability") (emphasis added). The Complaint clearly alleges both a reasonable modification claim and a program access claim. Of course, these claims are factually and logically interrelated.

Exhibit A, page 10

1    individuals with disabilities to maximize employment, economic self-sufficiency,

2    independence, and inclusion and integration into society, through . . . the guarantee of

3    equal opportunity. . .") *with* 42 U.S.C. § 12101 ("the purpose of this chapter" includes

4    "the elimination of discrimination against individuals with disabilities"); *see also*

5    *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir.1997) (noting that "Congress has

6    directed that the ADA and RA be construed consistently") (citing 42 U.S.C. §

7    12134(b)); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1216 n. 27 (9th Cir. 2008

8    (observing that "Title II of the ADA was expressly modeled after § 504 of the [RA]"

9    and that "[t]here is no significant difference in analysis of the rights and obligations

10    created by the ADA and the [RA]") (quotations and citations omitted). Thus, unless

11    otherwise noted, references herein to one statute apply equally to the other.

12       "Congress enacted the ADA in 1990 to remedy widespread discrimination

13    against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).

14    Because Congress perceived that discrimination against the disabled is "most often the

15    product, not of invidious animus, but rather of thoughtlessness and indifference—of

16    benign neglect," *Alexander v. Choate*, 469 U.S. 287, 295 (1985), the ADA proscribes

17    not only "obviously exclusionary conduct," but also "more subtle forms of

18    discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that

19    interfere with disabled individuals' full and equal enjoyment" of public places and

20    accommodations. *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir.

21    2011) (en banc) (internal quotation marks and citations omitted).

22       The statute provides a "comprehensive" and "broad mandate" to eliminate

23    discrimination against disabled persons, addressing both "outright intentional

24    exclusion" as well as the "failure to make modifications to existing facilities and

25    practices." *PGA Tour,* 532 U.S. at 675 (internal quotation marks and citations

26    omitted); *see also Cohen v. City of Culver City*, 754 F.3d 690, 694 (9th Cir. 2014); 42

27    U.S.C. § 12101(b)(1). Courts "construe the language of the ADA broadly to advance

28    its remedial purpose." *Cohen*, 754 F.3d at 695.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II thus imposes program-accessibility requirements on state and local governments. It requires these entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Similarly, Section 504 of the Rehabilitation Act prohibits any "program or activity" that receives federal funds from discriminating against disabled individuals. 29 U.S.C. § 794(a).

### B. Elements of Program-Accessibility Claims Under Title II of the ADA and Section 504 of the RA

To prove that the City violated Title II of the ADA, Plaintiff must show that (1) she is a "qualified individual with a disability"; (2) she was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of her disability. *See* 42 U.S.C. § 12132.

To prove that the City violated Section 504, Plaintiff must show that (1) she is an "individual with a disability"; (2) she is "otherwise qualified" to receive the benefit; (3) she was denied the benefit of the program solely by reason of her disability; and (4) the program receives federal financial assistance. *See* 29 U.S.C. § 794 (emphasis added).

Thus, the elements of a Title II program-accessibility ADA claim and a Section 504 claim are largely coextensive, except Title II applies to public entities, and Section 504 applies to any entity that receives federal financial assistance. *See, e.g.,*

*Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999) (stating elements of ADA and RA claims).

### C. Plaintiff Has Established her Prima Facie Case that the City Violated the ADA and Section 504.

Having applied the applicable law to the undisputed facts, the Court finds that Plaintiff has established her prima facie case that the City has violated Title II and Section 504.

### 1. The City is Subject to the ADA and the RA.

It is undisputed that the City is a public entity and that it receives federal funding.[5] As such, the City is subject to the ADA and the RA.

### 2. Plaintiff is a Qualified Person with a Disability.

The undisputed facts establish that Plaintiff is a qualified person with a disability. A person has a disability under the ADA if that person has a "physical or mental impairment that substantially limits one or more major life activities of such individual. . ." 42 U.S.C. 12102(1)(B). "Major life activities" include, as relevant here, "walking, standing, . . . bending. . ." 42 U.S.C. § 12102(2)(A). The RA defines "disability" similarly. *See* 29 U.S.C. § 705(9) (definition of "disability"); *McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 980 (10th Cir. 1998) ("The RA defines 'disability' in the same way as the ADA.").

It is undisputed that Plaintiff has cerebral palsy and related physical conditions that cause her difficulty walking. Also, in 2012, Plaintiff broke her foot and a pin was inserted to repair it, but the foot remains inflexible, further compounding Plaintiff's difficulty walking. As a result, Plaintiff has difficulty walking distances greater than 50 feet, walking up and down stairs, walking up and down sloped surfaces, and

---

[5]   The City argues that the RA does not apply because Calle Miramar – the street where Plaintiff resides – does not receive federal funding. Calle Miramar is not a public entity; it is merely a street, and as such, it cannot "do" anything, including receive funding. The City is without question the public entity with jurisdiction over Calle Miramar, and it receives federal funding, so it is subject to the RA.

10.

walking on uneven ground.  Plaintiff also has a disabled parking permit issued by the State of California.  These facts prima facie establish that Plaintiff is substantially limited in the activity of walking and that she is therefore disabled.

The City has not pointed to any evidence that raises a triable issue as to Plaintiff's disability.  Instead, the City insinuates unconvincingly that Plaintiff might not be as limited as she claims to be.  For example, the City argues that because Plaintiff evidently walks sometimes – including distances greater than 50 feet – uses stairs sometimes, and has participated in exercise such as swimming and even skiing at some point, the extent of her disability is disputed.  *See, e.g.,* City's RSUF 19, 20, 92, 93.[6]  However, some degree of physical ability is not inconsistent with having a disability: a person is disabled if she has a physical impairment that "substantially limits" *even one* major life activity.  *See* 42 U.S.C. § 12102(1)(B); *c.f., Bragdon v. Abbott*, 524 U.S. 624, 641 (1998) ("When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable.").

The evidence establishes beyond question that Plaintiff is limited in the major life activity of walking.  Dr. Chun, a physician who specializes in treating people with spinal injuries and disabilities, states that the physical conditions attendant to Plaintiff's cerebral palsy include muscle spasticity (spastic diplegia) that causes a scissoring gate; downward-pointing feet that are unstable when they bear weight; a lurching gait; and a permanent 20-degree bend at the joint where her hips and thighs meet.  *See* Chun Decl. (Dkt. No. 41-22) ¶ 11-18.  The pin in Plaintiff's foot makes her more unstable because it renders her foot less flexible and causes pain.  *Id.* ¶ 19.  Dr. Chun concluded that Plaintiff's "spastic diplegia combined with [her] numerous mobility impairments . . . substantially limit [her] ability to walk and climb stairs."  *Id.*

---

[6]  Even if 50 feet is an imperfect estimate of the distance Plaintiff can walk, or if Plaintiff sometimes walks more than 50 feet, it is clear that the longer the distance, the more difficulty Plaintiff has walking it.  This, too, is sufficient to show that Plaintiff has a disability.

¶ 20.   Furthermore, insofar as Plaintiff does walk or use stairs, she does so with difficulty and risks injury; with respect to exercise activities like swimming and skiing, she could "do them to a limited extent" but not well.  Chun Decl. ¶ 28.  And contrary to the City's argument, Dr. Chun's opinion is based not just on Plaintiff's own representations, but also on a thorough physical exam that included various tests and a review of Plaintiff's medical records, physical therapy notes, and surgery notes.  Chun Decl. ¶ 11.  Plaintiff has established that she is substantially limited in the life activity of walking.

Insofar as the "qualified" element is in issue, there is no dispute that Plaintiff is a resident of Torrance, evidently has a driver's license, drives, and has a disabled parking placard issued by the State of California.  It is also undisputed that Plaintiff parks curbside in her neighborhood.  Plaintiff is therefore qualified to use and benefit from curbside parking in Torrance, so she has established that she is a qualified individual with a disability.

### 3.   The City Discriminated Against Plaintiff Because of Her Disability By Denying her a Reasonable Modification that Would Provide Meaningful Access to a City Service, Program, or Activity.

Under Title II and Section 504, a public entity discriminates against a person with a disability if it fails to provide a disabled person a reasonable modification necessary to give the person meaningful access to a public service, program, or activity.  *See Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) ("An organization . . . violates § 504 if it denies a qualified individual with a disability a reasonable accommodation that the individual needs in order to enjoy meaningful access to the benefits of public services."), and *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004) (failing to provide a reasonable accommodation is a form of discrimination under the ADA); *see also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1086 (9th Cir. 2004) ("[T]he ADA defines discrimination as a public accommodation treating a disabled patron the same as other patrons despite the

12.

former's need for a reasonable modification.").  Both Title II and Section 504 require that disabled persons receive "meaningful access" to a public entity's services, not merely "limited participation."  *See Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) (so stating, in reliance on *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

### a. On-Street Parking is a City Service, Program, or Activity.

The parties' disagree vehemently over whether on-street parking is a City service, program, or activity such that it is subject to the program-accessibility requirements of Title II and Section 504.  Plaintiff points to the Ninth Circuit's broad reading of "program, service, or activity," which is informed by the ADA's broad remedial purpose, to argue that on-street parking is a service, program, or activity.  The City, by contrast, argues that the City does nothing with respect to on-street parking, especially in residential areas, so it cannot be said to have an on-street parking "program" and is thus not obliged to make existing on-street parking accessible to disabled persons.

### i. The Phrase "Services, Programs, or Activities" Encompasses Anything a Public Entity Does.

The Court begins its analysis with the statutory language.  The ADA does not define the "services, programs, or activities of a public entity."  The RA defines "program or activity" as "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government."  29 U.S.C. § 794(b)(1)(A).  The legislative history of the ADA supports construing it generously and consistently with the RA, stating that Title II "essentially simply extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act] to all actions of state and local governments." H.R.Rep. No. 101–485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367 (emphasis added); *see also id.* at 151, *reprinted in* 1990 U.S.C.C.A.N. 303, 434 ("Title II . . . makes all activities of State and local governments subject to the types of prohibitions against discrimination . . . included in section 504. . .") (emphasis added).  Indeed, the ADA

13.

expressly prohibits courts from construing Title II to apply a lesser standard than the RA and its implementing regulations.  *See* 42 U.S.C. § 12201(a) ("nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973. . . or the regulations issued by Federal agencies pursuant to such title").

Consistent with the foregoing, in *Barden v. City of Sacramento*, which concerned public sidewalks, the Ninth Circuit cautioned against engaging in "needless 'hair-splitting arguments'" and held that the ADA's use of the phrase "services, programs, or activities"  "'bring[s] within its scope anything a public entity does.'" *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (brackets and quotations omitted).   Stated slightly differently, whether a particular public function is covered by Title II and Section 504 turns "not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is 'a normal function of a governmental entity.'") *Id.* (quotation omitted).

### ii.  On-Street Public Parking Is A "Program, Service, or Activity."

There appear to be no cases applying this standard to decide whether unmarked, on-street parallel parking in a residential neighborhood is covered by Title II. However, cases dealing with a different configuration of on-street parking and with sidewalks throughout a city are instructive.

In *Fortyune v. City of Lomita*, 766 F.3d 1098 (9th Cir. 2014), cert. denied sub nom. *City of Lomita, Cal. v. Fortyune*, 135 S. Ct. 2888 (2015), the Court addressed whether on-street diagonal stall parking was subject to Title II.  Relying on the broad statutory language summarized above and on *Barden*'s reasoning that "local governments must maintain accessible sidewalks because 'maintaining public sidewalks is a normal function of a city and without a doubt something that the City does,' " the Court concluded "that local governments must maintain accessible on-street public parking."  *Fortyune*, 766 F.3d at 1102.  Going beyond the statute itself,

14.

the Court also found that applicable "regulations *do* require accessible on-street parking." *Id.* at 1102 (emphasis in original).  Specifically, 28 C.F.R. § 35.150(a) requires public entities to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."  This section in turn applies to "existing facilities," which includes "roads, walks, passageways, . . . or other real . . . property." 28 C.F.R. § 35.104.  Accordingly, the Court construed § 35.150's program-accessibility mandate as applying to "all normal governmental functions, including the provision of on-street public parking." *Fortyune*, 766 F.3d at 1103.  There appears to be no reason to exclude some kinds of on-street parking from Title II's program-accessibility mandate.  If §§ 35.150(a) and 35.104 encompass "roads," they must also encompass the portion of the roads adjacent to the curbs and the parking that occurs thereon.  Thus, like the diagonal stall parking in *Fortyune*, the on-street parallel parking in issue here is a normal governmental function and subject to Title II.

The City nevertheless argues that *Fortyune* is distinguishable because it concerned marked, diagonal parking stalls and not the unmarked and unmetered parallel parking that is in issue here.  *See* Opp'n 12:7-18.  Indeed, a footnote in *Fortyune* explains that the plaintiff had dismissed his program access claim insofar as it was based on parallel parking.  *See Fortyune*, 766 F.3d at 1101 fn. 1 (stating that before the district court ruled on the motion to dismiss, the plaintiff "voluntarily dismissed his claims with respect to parallel on-street parking [so] the district court's order and this appeal concern only whether [plaintiff] has stated claims based on the City's failure to provide accessible diagonal stall on-street parking.").

But the Court's mere recital of this procedural twist does not suggest that the distinction between diagonal stall on-street parking and parallel on-street parking makes any difference: neither the statutes, nor their implementing regulations, nor the cases applying them suggest that whether on-street parking is a "program" turns on the vagaries of its configuration.  The City agues, however, that the diagonal stalls in

15.

*Fortyune* were deemed a program, service, or activity because the entity took affirmative steps to establish those parking stalls, whereas here, the City claims it does nothing with respect to the unmarked and unmetered parallel parking. The City claims its only "activity" with respect to parking is that it does not prohibit it, and that merely not prohibiting the public from doing something cannot trigger Title II's program-access mandate. The City suggested that it is so passive with respect to parallel parking in its residential neighborhoods that were the Court to find it a program, service, or activity, then a city-owned vacant lot must also be deemed a program, service, or activity, and thus subject to Title II's accessibility requirements, so long as anyone used it in any way. *See* Opp'n 12:13-13:8 (stating that "[i]f every activity undertaken on public property constitutes a de facto public 'program,' then liability under Title II would be virtually limitless," and providing examples).

But the Court's conclusion does not lead to this absurd result because providing parallel parking is distinguishable from owning a vacant lot. The City built, maintains, and regulates its streets, including their curbside portions, to accommodate curbside parking; it is fair to say that sufficient width for parallel parking is a design feature of the City's streets and that therefore providing parallel parking is one of the very purposes of the City's streets. Parallel parking appears to be an integral element of the City's transportation arrangements. Interestingly, the City admits that the street itself is a "'program' serving a vehicular transit purpose." *See* Opp'n 16:5-8. It therefore follows that because parallel parking on the street serves the purpose of facilitating transportation around the City, it too is a program. By contrast, merely owning a vacant lot and acquiescing to some uninvited and unregulated public use of it does not constitute any kind of activity by a city, and does not cause that lot to serve any purpose that can be reasonably considered a normal function of a governmental entity. Thus, a determination that unmarked and unmetered parallel parking is subject to Title II does not lead down the City's slippery slope. To the contrary, the vacant-lot comparison well-illustrates why the parallel parking here is a program, service, or

16.

activity: because providing parallel parking is something the city does, is "a normal function of a governmental entity," and meets a public need within the City's transportation scheme, it is subject to Title II, whereas owning a vacant lot is simply not something the City does, and it appears to serve no public need, so it is not subject to Title II.

In addition, the City's claim that it is completely passive with respect to parallel parking is belied by the facts. The City's streets did not design and build themselves; rather, they were designed and built by the City with enough room to simultaneously accommodate both through-traffic and parallel parking. The City also maintains its streets, including the curbside portion, by, for example, repairing the asphalt and periodically refreshing the paint on the curb, thereby keeping the curbside usable for parking. Such tasks are comparable those that cities perform to maintain sidewalks, an activity that *Barden* deemed a program, service, or activity. *See Barden*, 292 F.3d at 1076 ("In keeping with our precedent, maintaining public sidewalks is a normal function of a city and without a doubt something that the [City] 'does.' Maintaining their accessibility for individuals with disabilities therefore falls within the scope of Title II.") (citation omitted). Thus, *Fortyune's* analogy between sidewalks and curbside parking remains instructive.

Furthermore, the City can and does regulate and control curbside parking in numerous ways. *See* Torrance Muni. Code, Article 6 (Pl.'s RJN Exh. A). For example, the City regulates curbside parking by painting the curb, establishing parking rules, posting signs explaining those rules (such as warning residents that vehicles parked on the street during street sweeping hours will be towed), and specifying how vehicles should be parked (i.e., no more than 18" from the curb). Relatedly, if the City wanted to prohibit parallel parking on its streets, it could do so and post "no parking" signs. The City also employs parking enforcement officers and can tow "[a]ny vehicle which has been parked or left standing upon any street or highway for seventy-two (72) hours." Torrance Muni. Code 61.6.3(a). And, in

17.

connection with this very case, the City established the 20-minute curbside parking space in front of Plaintiff's apartment.

While it is true that the City does not mark and meter parallel parking, the City has not shown that marking and metering are the *sine qua non* of a parking program. As noted above, it does not take much for something to be a program for purposes of Title II: a program encompasses anything that a public entity does. People do not parallel park in the City in conditions of anarchy; the City itself all but invites them to parallel park on its streets, maintains conditions favorable for parallel parking, and regulates it. Thus, parallel parking is a City program, service, or activity, so it is subject to the program-access requirements of Title II and Section 504.

### iii. Curbside Parking is Covered by Title II Even Under A Narrower Standard Employing Dictionary Definitions.

The Ninth Circuit determined relatively easily that sidewalks and diagonal stall parking were subject to Title II without devolving into "needless 'hair-splitting arguments.'" *See Barden*, 292 F.3d at 1076 (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997). By contrast, in *Frame v. Arlington*, the Fifth Circuit arguably engaged in hair-splitting over whether sidewalks were covered by Title II, but it abandoned that approach *en banc* and instead applied dictionary definitions of the word "service" to find that sidewalks are covered by Title II. *See Frame v. City of Arlington*, 616 .3d 476, 480 (5th Cir. 2010), *vacated and reh'g en banc granted*, 632 F.3d 177 (5th Cir. 2011). Even under the Fifth Circuit's approach, which appears to be narrower than the Ninth Circuit's, on-street parallel parking would be covered by Title II. The court will briefly discuss this case.

In *Frame v. Arlington*, the Fifth Circuit initially held that sidewalks were not in themselves a program, service, or activity, and that sidewalks were only subject to Title II if they prevented access to some other "actual" government service. *Frame*, 616 3d at 480. The Court reversed itself *en banc* and ruled that building and altering

18.

city sidewalks, and the sidewalks themselves, "unambiguously [are] a service, program, or activity of a public entity." *Frame*, 657 F.3d at 226-228.  The Fifth Circuit did not embrace the Ninth Circuit's formulation that "programs, services, and activities" embraces anything a public entity does.  Instead, it relied on a statement from the Supreme Court, in another context, that "service" means "the performance of work commanded or paid for by another," or "an act done for the benefit or at the command of another." *Id.* at 226 (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)).  It also relied on Webster's Dictionary's definition of a "service" as "the provision, organization, or apparatus for. . . meeting a general demand" and on Black's Law Dictionary's definition of a "public service" as work "provided or facilitated by the government for the general public's convenience and benefit." *Id.* at 226 (quotations and citations omitted).  Applying these definitions, the Fifth Circuit found that building and maintaining sidewalks, along with the sidewalks themselves, are services. *Id.*  Similarly, under these definitions, building and maintaining streets that provide parallel parking, along with the parallel parking itself, are also clearly services: building and maintaining streets to accommodate parallel parking is the provision of something to meet a general demand for parking, and curbside parking itself is something "provided or facilitated by the government for the general public's convenience."  Thus, even stepping away from the Ninth Circuit's formulation that Title II applies to everything a public entity does, and instead applying a Supreme Court and dictionary definition of "service," parallel parking is a service, program, or activity, so it is covered by Title II.

### iv. The City's Remaining Arguments Do Not Show that Parallel Parking Is Not Subject to Title II.

None of the City's other arguments undermine the above reasoning.

Citing *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 986-87 (9th Cir. 2014), the City urges the court to parse its activities so as to find that it does not have a *parking* program, but instead has a *street sweeping* program by which it only

19.

incidentally monitors parking such as by prohibiting parking during street-sweeping hours. *See* MSJ Tr. 59:5-25. This is the sort of "needless 'hair-splitting argument[]'" that the Ninth Circuit has cautioned against. *See Barden*, 292 F.3d at 1076 (citation omitted). In any event, *Daubert* is plainly distinguishable. In *Daubert*, the wheelchair-bound plaintiff argued that the bleachers at a high school football field constituted a distinct program, and he claimed that the school district violated the ADA because it did not make the bleachers accessible but instead designated field-level locations for spectators in wheelchairs. *Id.* at 984. The Ninth Circuit rejected the plaintiff's contention that the relevant "program" was the bleachers. The Court stated that the bleachers were a facility, not a program, and that the ADA does not require an entity to make each of its existing facilities accessible as long as the program as a whole is accessible. *Id.* at 987 (citing 28 C.F.R. § 35.150). Instead, the relevant program was high school football; the "particular social experience [of sitting in the bleachers] is merely incidental to that program and not fairly characterized as 'a normal function of a government entity.'" *Id.* at 987. Because the field-level locations gave the plaintiff meaningful access to the program – watching high school football – the school district did not violate the ADA by not modifying the bleachers. Here, the City's parking-related activities cannot fairly be characterized as merely "incidental" to other programs: parallel parking is an essential element of the City's street design and maintenance, controlling on-street parking is clearly "a normal function of a government entity," and the City can and does regulate and control curbside parking in numerous ways independent of its other activities, as reflected by the Torrance Municipal Code.

Relatedly, that the curb itself may be deemed a facility does not mean that the parallel parking it facilitates is not a service. The ADA anticipates that, in order to make a program, service, or activity accessible, an entity may have to "alter[] existing

20.

facilities." *See* 28 C.F.R. § 35.150(b)(1).[7]  Here however, as discussed below, the City would not even have to "alter" any facility; it would only need to paint the curb blue and install a sign in order to make its parallel parking program more accessible. Thus, there is no contradiction between the curb being a facility and parallel parking being a program, service, or activity.

The City also suggests that because the street in issue is a residential street rather than a commercial street, Title II does not apply. *See, e.g.*, Opp'n 2:6-9.  But the residential-commercial distinction does not determine whether the ADA in general, or Title II in particular, apply to a particular program or facility, but rather it determines the priority in which an entity should modify its programs or facilities to comply with the ADA. *See, e.g.*, 28 C.F.R. § 35.150(d)(2) (stating that a schedule for providing accessible intersections should give "priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas.").[8]  Therefore, parallel parking on Calle Miramar is subject to Title II even though Calle Miramar is a residential street.

### b. The City Discriminated Against Plaintiff by Denying her a Reasonable Modification.

It is undisputed that Plaintiff sought to enjoy the benefit of curbside parking in the City. Plaintiff parallel parks her car in her neighborhood.  However, because parking is available on a first-come, first-served basis, it is frequently unavailable in front of Plaintiff's home.  When parking is not available in front of her home, Plaintiff must park farther away, and as a result, she must traverse greater distances along sometimes unlevel and unpaved terrain, all of which is difficult and hazardous for

---

[7]  Notably, however, § 35.150, does not require an entity "to make structural changes in existing facilities where other methods are effective in achieving compliance." *Id.*
[8]   The City has not argued that it has a transition plan that incorporates modifying its residential on-street parking program, or that it has any procedures in place to respond to modification requests.

21.

1   Plaintiff in light of her disability.  Alternatively, Plaintiff must try to have someone
2   else park her car or must wait until a closer space opens up.  That nearby curbside
3   parking is often unavailable deprives Plaintiff of independent access to the
4   community, as she must experience pain and a greater risk of falling when she parks
5   far from her home, depend on others to drive her places or to park her car, or opt to
6   not travel beyond her home at all.  Thus, because of Plaintiff's disability, first-come,
7   first-serve curbside parking and the benefits it offers are not reasonably available to
8   her.

9       Plaintiff asked the City to make curbside parking more accessible to her by
10  designating a single space in front of her apartment as disabled-only parking by
11  painting the curb blue.  Granting Plaintiff's request by painting the curb blue and
12  installing appropriate signage would cost about $2,205, a modest sum whose
13  reasonableness is evident and undisputed.  But the City denied Plaintiff's request and
14  instead designated that space as a 20-minute green zone, which imposes a 20-minute
15  parking limit between the hours of 8:00 a.m. and 6:00 p.m. on weekdays and
16  Saturday.  At all other times (i.e., from 6:00 p.m. to 8:00 a.m. on weekdays and
17  Saturdays, and all day Sundays), and on holidays, the 20-minute limit does not apply
18  and parking in the green zone space is unrestricted.  However, vehicles (like
19  Plaintiff's) that display a disabled parking placard are not subject to the 20-minute
20  limit at all so they can be parked in a green curb space without restriction.

21      Under the RA and the ADA, "an otherwise qualified handicapped individual
22  must be provided with meaningful access to the benefit that the [entity] offers."
23  *Alexander*, 469 U.S. at 301; *see also Baughman v. Walt Disney World Co.*, 685 F.3d
24  1131, 1135 (9th Cir.2012) (the ADA "guarantees the disabled more than mere access
25  to public facilities; it guarantees them 'full and equal enjoyment.'").  It therefore
26  follows that a modification is not adequate if it does not provide meaningful access.
27  *See Mark H.*, 620 F.3d at 1097 ("An organization . . . violates § 504 if it denies a
28  qualified individual with a disability a reasonable accommodation that the individual

22.

1   needs in order to enjoy meaningful access to the benefits of public services.").  Under
2   a "meaningful access" standard, an entity is "not required to produce the identical
3   result . . . for handicapped and nonhandicapped persons," but they nevertheless "must
4   afford handicapped persons equal opportunity to . . . gain the same benefit." *Argenyi*
5   *v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013) (citation omitted); *c.f.,*
6   *Baughman*, 685 F.3d at 1135 (company must consider "how their facilities are used by
7   non-disabled guests and then take reasonable steps to provide disabled guests with a
8   like experience.").

9       The 20-minute green curb parking space is not a reasonable modification of the
10  City's parking program because it does not provide disabled persons meaningful
11  access.  According to Plaintiff's calculations – which the City does not dispute – the
12  green curb space remains unrestricted almost 70% of the time, and notably in the
13  evenings, Sundays, and holidays, when the demand for curbside parking is the
14  greatest.  As a result, the green curb space is often unavailable when Plaintiff most
15  needs to use it, so she must resort to parking far away, waiting for the space to open
16  up, or seeking help, or she can avoid these difficulties altogether by refraining from
17  any trips that require her to return home during those hours.

18      The City contends that the green curb space is adequate because Plaintiff often
19  returns from work when the 20-minute limit is still in effect, suggesting that, at worst,
20  if the space is occupied, she may have to wait 20 minutes for it to become available,
21  and then she can park there all evening.  This suggestion is utterly impractical because
22  it requires Plaintiff to wait in her car on the street, presumably either double-parked or
23  along a portion of the roadway where parking is not permitted, hovering there until the
24  space's current occupant leaves.  The City also evidently expects Plaintiff to entirely
25  forego leaving her home in the evening, or at all on Sundays and holidays, just in
26  order to avoid relinquishing the green curb space during those times.  Non-disabled
27  persons are not subject to similar constraints and inconvenience.  The City also
28  suggests that the 20-minute space might be more available to Plaintiff than a blue zone

23.

1   space: because other people – including those with disabilities – might not be familiar
2   with how the 20-minute limit is enforced, Plaintiff might be the only disabled person
3   to routinely use it.  *See, e.g.*, City's RSUF 57.  But predicating Plaintiff's access to
4   parking on other peoples' ignorance of parking rules is both implausible and, frankly,
5   patronizing.  And, while the City insinuates that its residents would object to its
6   installing a disabled parking spot, it has not shown that this is a relevant consideration,
7   and furthermore, it seems more likely that residents would have greater objections if
8   someone constantly occupied a 20-minute parking spot.  The City's cavalier
9   expectations amount to another set of obstacles for Plaintiff to overcome just to have
10  reasonable access to parallel parking in her neighborhood.  The ADA and the RA
11  were enacted to remedy just these sorts of unnecessary obstacles imposed on disabled
12  persons.  Because the 20 minute parking spot so clearly falls short of giving Plaintiff
13  the meaningful access that the ADA and the RA require, it is not a reasonable or
14  sufficient modification as a matter of law.

15      The Court also rejects the City's argument, based on *Jones v. City of Monroe,*
16  *MI*, 341 F.3d 474 (6th Cir. 2003) and *Kornblau v. Dade Cnty*., 86 F.3d 193 (11th Cir.
17  1996), that the modification Plaintiff requested – a blue curb parking space – is either
18  unreasonable or unnecessary, or special treatment to which she is not entitled.  These
19  cases do not support the City's position.  In *Jones v. Monroe*, the disabled plaintiff
20  asked the City to excuse her from the 1-hour limit on the free on-street parking in
21  front of her workplace so that she could park there all day.  The Court found that the
22  City did not have to grant this request because there was an alternative: it provided
23  free all-day parking, with designated handicap spaces, at a nearby parking lot. [9]  *Jones*,

---

[9]   The majority in *Jones* characterized the free all-day parking lots as "a short distance
25   away" without acknowledging, as the dissent did, that the "short distance" (592 feet)
     was too far for the plaintiff to walk.  Regardless, however, this omission does not aid
26   the City here because is it undisputed that Plaintiff frequently does not have the
     alternative of parking "a short distance away" (however measured) from her home.
27   Insofar as *Jones* suggests that whether a disabled person has "meaningful access" to a
     program has little to do with whether, as a practical matter, that person can actually

Exhibit A, page 27

341 F.3d at 479.  Here, by contrast, the City has not designated any handicap on-street spaces, so Plaintiff does not have any nearby designated parking that she can reliably access.   In *Kornblau v. Dade Cnty.*, the Court found that the plaintiff was not entitled to use the county's employees-only parking lot because that lot was available only to employees and not to the public.  *Kornblau*, 86 F.3d at 196.  Thus, the plaintiff's claim failed because she sought a special benefit not available to other members of the public: the right to part in an employees-only lot.[10]  Here, Plaintiff is only seeking meaningful access to a benefit available to all other members of the public: on-street parking.  For these reasons, neither *Jones* nor *Kornblau* are persuasive.

### D.   The City has Failed to Raise a Triable Issue as to Its Affirmative Defenses.

The City argues that it need not modify its on-street parking program because it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. § 35.130(b)(7), and that the modification would result "in undue financial or administrative burdens." 28 C.F.R. § 35.164.  Relatedly, the City also asserts that Plaintiff's requested accommodation is unreasonable in that it is structurally impracticable.  The City bears the burden of proving these defenses, and the court finds that it has not raised a triable issue as to any of them.

First, the City's fundamental alteration defense fails insofar as it rests on the premise that it has no parking program.  As discussed above, the City *does* have a parking program, so requiring it to provide a disabled parking space would not require it to start a new program.

Otherwise, the City's defenses all rest on the City's claim that it could not simply paint the curb blue, as Plaintiff requests, but would have to install various

---

use the program, this Court disagrees for the reasons stated in Judge Cole's dissent.  *See Jones*, 341 F.3d at 481-491 (COLE, Circuit Judge, dissenting).

[10]   In addition, the county did provide accessible parking spaces in the nearest public lot.  *Kornblau*, 86 F.3d at 196.

Exhibit A, page 28

other features required by state and federal standards to make the parking space fully accessible. Specifically, the City claims that it would have to, at a minimum, "[c]reate an access aisle that is at least 60 inches wide and does not encroach in any lanes of traffic. . . [r]ip out the pavement, curb and gutter in front of Plaintiff's apartment to install curb cuts and a curb ramp. . . [i]nstall a pedestrian access route along the entire length of Calle Miramar that is at least 60 inches wide. . . [and] [p]otentially, rip out, grade, and repave a section of the existing street, and acquire additional right of way from the adjoining property owner, so that the cross-slope of the parking space and loading zone does not exceed 2%." *See* Opp'n 7:21-8:10. In short, the City would have to "reconfigure the street along Calle Miramar." *See* Opp'n 22:23-27. The City asserts that this "colossal undertaking. . . would cost the City hundreds of thousands of dollars" – a burden that is unreasonable because Plaintiff has been parking curbside for almost ten years, has parking available in the garage of her apartment building, and is a month-to-month tenant who has no long-term commitment to her residence. *Id.* at 7:21-26, 8:12-18.

### 1. No Applicable Design Standards Require the City to Reconfigure the Street or Perform Any Other "Colossal Undertaking."

These defenses fail for the simple reason that, as the City admits, there are no applicable technical standards that require a public entity to include any of the costly and elaborate accessibility features it identifies. *See* Bilezerian Depo. (Elliot Decl. Exh. 2) 106:14-15 ("There are no other guidelines for work in the public right-of-way, so we have to use [the guidelines for private parking spaces that are on private property] as a reference."). The only applicable guidance is Cal. Veh. Code § 2511.7(b)(1), and it does not include any technical specifications; it requires only that when a local authority designates a disabled parking space, "it shall [] paint [] the curb or edge of the paved portion of the street adjacent to the space [and] post immediately adjacent to and visible from the space a sign consisting of a profile view of a wheelchair with occupant in white on a blue background." These are the only tasks

26.

the City must perform to designate a disabled parking space.  The other technical design standards that the City cites are not applicable.

The City gets some of the more demanding technical design standards it relies on from the 2010 ADA Standards for Accessible Design, but, as the City itself admits, these standards are for off-street parking and do not apply to on-street parking.  *See* Opp'n 17:25-27 ("The ADA Guidelines do not have any technical standards specific to on-street parking spaces. . ."); s*ee also Fortyune*, 766 F.3d at 1103 ("the 1991 Standards [] and the 2010 Standards contain detailed specifications for a range of different facilities, but none of them address on-street parking.").  Citing the DOJ's Title II Technical Assistance Manual ("DOJ TAM"), the City contends that it is required to apply the off-street parking standards to on-street parking "to the extent possible."  *See* Opp'n 17:20-18:6 (citing DOJ TAM § II-6.2100 (Dennington Decl. Exh. 1)).  However, those sections of the DOJ TAM apply only to "new construction and alterations,"[11] not to existing circumstances.  In any event, the Manual further provides that, "[i]f no standards exist for particular features, those features need not comply with a particular design standard."  DOJ TAM § II-6.2100.  Accordingly, the ADA Guidelines do not impose any technical requirements for existing on-street parking.

---

[11]  The City wisely does not make this argument, but the Court observes that painting the curb and installing a sign do not amount to "altering" an existing facility and thus would not in turn trigger the DOJ TAM standards.  The regulations define alteration as "a change to a place of public accommodation or commercial facility that affects or could affect the usability of the building or facility or any part thereof."  28 C.F.R. § 36.402(b).  The regulations provide the following illustrations as to what may or may not amount to an alteration: "Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. *Normal maintenance*, reroofing, *painting* or wallpapering, asbestos removal, or changes to mechanical and electrical systems *are not alterations* unless they affect the usability of the building or facility."  *Id.* § 36.402(b)(1) (emphasis added).  Painting a curb and installing a sign next to it do not affect the usability of the curb or street, so they do not constitute an alteration.

27.

1    The City also references Proposed Right-of-Way Guidelines published by the

2    U.S. Access Board.  *See* Proposed Guidelines (Dennington Decl. Exh. 3).  These

3    Proposed Guidelines do include technical specifications for on-street parking, but they

4    apply only to newly constructed facilities, altered portions of existing facilities, and

5    elements added to existing facilities.  *See id.* § R201.1.  Furthermore, the Proposed

6    Guidelines have not yet been adopted, so no one – including the City – is obligated to

7    follow them.

8    Finally, the City draws some of these specifications from the California

9    Department of Transportation's ("Caltrans") "Standard Plan" for on-street accessible

10   parking.  *See* Caltrans Guidelines (Dennington Decl. Exh. 4).  Caltrans has

11   jurisdiction over "all state highways and all property and rights in property acquired

12   for state highway purposes."  Cal. Streets & Highways Code § 90.  Calle Miramar is a

13   local street and is therefore not subject to Caltrans's jurisdiction, so the Standard

14   Plan's technical specifications do not apply.

15   No authority mandates that the only way the City can increase the accessibility

16   of its on-street parking is with the expensive "colossal undertaking" that the City

17   describes in its brief.  There are no technical accessibility standards governing existing

18   on-street parking.[12]  To rule that inapplicable and relatively demanding accessibility

19   standards excuse the City from making its parking program more accessible is

20   completely inconsistent with the intent and structure of the ADA and the RA –

21   statutes aimed at *increasing* accessibility.  Indeed, the regulations themselves forbid a

22   public entity from "utilize[ing] criteria . . . [t]hat have the . . . effect of defeating or

23

_____

24   [12] Ironically, the City cited the absence of standards when it responded to Plaintiff's
     request to designate a disabled parking space, suggesting that, in the absence of
25   technical standards, it didn't know what to do.  *See* Berk Decl. Exh. E (letter from
     Assistant City Attorney Patrick Sullivan to Berk, stating, "I am still confused as to
26   where the standards are to be found for accessible on-street parking.  I have not been
     able to find any regulations that describe the dimensions, maximum slope, painting,
27   signage, and safe path of travel requirements for accessible on-street parking spaces.
     Further, I have been unable to find any design standards. . .").
28

Exhibit A, page 31

1    substantially impairing accomplishment of the objectives of the public entity's

2    program with respect to individuals with disabilities."  28 C.F.R. 35.130(b)(3)(ii).

3    The ADA and RA are not maximalist statutes; rather, they mandate incremental

4    change by imposing less stringent requirements for public programs and existing

5    facilities, and more stringent requirements for new facilities.  *Compare* 28 C.F.R.

6    35.150(a) (requirement that public entity must make its programs accessible to

7    persons with disabilities "does not [n]ecessarily require a public entity to make each

8    of its existing facilities accessible to and usable by individuals with disabilities") *with*

9    28 C.F.R. 35.151(a) (new facilities must be fully accessible unless that is structurally

10   impossible).  For all of these reasons, the more demanding standards that apply (now

11   or in the future) to different circumstances cannot justify the City's failure to

12   undertake simple measures to make its parking program more accessible today.  The

13   City presented no authority suggesting that doing as little as painting the curb blue and

14   installing a sign somehow runs afoul of the ADA.  Ultimately, the binary choice that

15   the City presents – between doing essentially nothing, and doing everything

16   conceivable – is a false choice that has no basis in the ADA, the RA, or any other law

17   the City cites.

18          **2.  The City's Fear of Tort Liability Is Based on Speculation and
19              Does Not Establish a Defense to Plaintiff's Claims.**

20          The City also claims that it could not install the basic blue curb parking space

21   that Plaintiff requests because doing so would create a dangerous condition and

22   expose it to tort liability.  *See* Opp'n 17:10-19, 23:28-24:5 (discussing Cal. Gov. Code

23   § 835 ("a public entity is liable for injury caused by a dangerous condition of its

24   property") and describing the danger a simple blue curb space would pose to other

25   disabled persons).  The City contends that a curbside parking space painted blue

26   signifies a fully-accessible parking space with all of the accessibility features

27   mentioned herein, such as an aisle and curb cuts.  A blue parking space lacking any of

28   these features would endanger other disabled persons, such as someone who uses a

29.

1  wheelchair and for whom an aisle and a ramp are necessary to fully access a parking
2  space.

3      This argument is purely speculative, as the City presents no evidence or
4  authority suggesting that people generally expect blue curb parking spaces to have
5  every accessibility feature.  Indeed, it is far more plausible that people would <u>not</u> have
6  such expectations: in light of the fact that there are no technical accessibility standards
7  governing existing parallel parking, blue curb parking spaces must necessarily vary in
8  the features they offer depending on the characteristics of the site.  Thus, the
9  suggestion that people who use those spots have come to assume that they all include
10 all accessibility features is unpersuasive.  The City's attenuated and unsubstantiated
11 fear of liability is not a legitimate reason to deny Plaintiff a reasonable modification.

12      At oral argument, the City pointed to *Cohen v. City of Culver City*, 754 F.3d
13 690 (9th Cir. 2014) as an example of a municipality subjected to tort liability for
14 failing to have an accessible curb ramp.  But *Cohen* does not vindicate the City's
15 claimed fear of tort liability because there, the plaintiff only sued the City for violating
16 the ADA; it does not appear that he asserted a tort claim (i.e., negligence) for damages
17 against the city.[13]

18      All of the City's affirmative defenses rest on the proposition that, in order to
19 make its on-street parking more accessible, it must undertake the extensive
20 construction project described in its briefing and summarized herein.  Because that
21 proposition is patently wrong, the City cannot raise a triable issue of fact as to these
22 affirmative defenses, and these defenses therefore fail.

---

23 [13]  *Cohen* is also factually distinguishable.  There, the city provided a curb ramp but
24 permitted a private vendor to block it during a vintage car show, and as a result, the
25 plaintiff tried to step up onto the sidewalk without the benefit of the curb ramp and got
   injured.  The Court simply held that whether the city denied the plaintiff access to a
26 public service by allowing the vendor to block the ramp was a triable issue.  *Cohen*,
27 754 F.3d at 700-701. And contrary to another of the City's arguments, *Cohen* does not
   support the City's proposition that it cannot provide a blue curb space without also
28 providing multiple other accessibility features such as a curb ramp.  *Cohen* simply has
   nothing to do with this latter issue.

Exhibit A, page 33

**E.      None of the City's Remaining Points Raises a Triable Issue Either as to Plaintiff's Prima Facie Case, or as to its Affirmative Defenses.**

The City makes several other arguments that are rendered moot by the above analysis, or that otherwise cannot be neatly categorized as relevant to Plaintiff's prima facie case or to its own affirmative defenses. The Court will address these arguments briefly.

**1.   Plaintiff Did Not Forfeit her Statutory Rights By Choosing to Live in Torrance.**

The City observes that Plaintiff "chos[e] to live in a popular beach community where available on-street parking is scarce at times." Opp'n 1:5-6. The relevance of this statement is not entirely clear. However, the Court can think of no interpretation that is not regrettable. To the extent the City suggests that its popularity and desirable beach location should exempt it from the ADA's and the RA's accessibility mandates, the provisions cited herein make perfectly clear that the City is mistaken. To the extent the City suggests that it is unrealistic for persons with disabilities to expect civilized access to the services, programs, and activities of a "popular beach community," the ADA and the RA do in fact entitle disabled persons to exactly that expectation. The ADA and the RA make it crystal clear that persons with disabilities belong anywhere they want to be; indeed, the very purpose of these statutes is to ensure that disabled persons enjoy the freedoms that all others enjoy and that they are not segregated from the rest of society by reason of their disability.

**2.   That Plaintiff is a Tenant and Not a Property Owner is Irrelevant.**

The City also suggests that because Plaintiff is a month-to-month tenant and not a property owner, she has no obligation to stay in the City, so the City could go through the effort and expense of installing an accessible parking space, and Plaintiff could just leave thirty days later. But, the City points to no authority stating that one's rights under the ADA and the RA are determined by whether one is a renter or a

31.

1    property owner.  And, in any event, this point loses its force entirely in light of the

2    above analysis showing that the City does not need to undertake an elaborate street

3    construction project to provide a reasonable modification, and that the cost of granting

4    Plaintiff's request would be trivial ($2,205).

### 3. That Plaintiff Has an Assigned Parking Space (Which She Cannot Use) Does not Mean She Does Not "Need" a Modification.

7        The City notes that Plaintiff has an assigned parking space in the garage in her

8    apartment building, but that she does not park in it.  The Court infers that this fact is

9    relevant to whether Plaintiff needs a modification and whether that requested

10   modification is reasonable: if Plaintiff has an assigned parking space at her disposal,

11   then she does not need on-street parking, so therefore any request for a modification to

12   make on-street parking accessible is therefore necessarily unreasonable.

13       *Baughman v. Walt Disney World Co.*, 685 F.3d 1131 (9th Cir. 2012) is

14   instructive on this point.  There, Disney World prohibited the disabled plaintiff from

15   using a Segway to access its park.   Disney World argued that the plaintiff did not

16   "need" to use a Segway because she could use a wheelchair or scooter instead, even

17   though using a wheelchair or scooter was impractical, painful, and difficult for her.

18   *Baughman*, 685 F.d at 1132.  Disney World in effect argued that an accommodation is

19   not "necessary" unless the person "can't do without" it.  *Id.* at 1134.  The Ninth

20   Circuit disagreed with this standard, observing that under Disney World's definition,

21   because "a paraplegic can enter a courthouse by dragging himself up the front steps . .

22   . lifts and ramps would not be 'necessary'" and that "no facility would be required to

23   provide wheelchair-accessible doors or bathrooms, because disabled individuals could

24   be carried in litters or on the backs of their friends."  *Id.* at 1134-1135.  The Court

25   reproached Disney World for its cramped interpretation, stating, "[t]hat's not the

26   world we live in, and we are disappointed to see such a retrograde position taken by a

27   company whose reputation is built on service to the public."  *Id.*

28       Here, that Plaintiff has an assigned parking space in her building's garage does

Exhibit A, page 35

not undermine her claim to "need" an on-street disabled parking space because she cannot, as a practical matter, use the garage parking space.  The two routes from the garage space to Plaintiff's apartment's front door are 100 feet and 240 feet long – much longer than the 50 feet from the on-street space closest to her front door – and have either a flight of stairs or a long, sloped driveway. Testimony from Plaintiff and Dr. Chun establish that given Plaintiff's disability, traversing either route from the garage parking space to her apartment is very difficult for Plaintiff and poses significant risks of falling, such that it is impracticable for her to park there.  It may not be *impossible* for Plaintiff to traverse these routes – she has used stairs and walked more than 50 feet before, and Plaintiff could even drag herself up the stairs and the sloped driveway – but this this is not the standard for assessing whether a modification is "necessary."  Furthermore, that Plaintiff has never parked in the garage during her entire residence at the apartment, has instead sought to park on the street despite the challenges involved, and has only recently[14] asked the City for a blue curb space reinforces the conclusion that Plaintiff cannot, as a practical matter, use the garage space.

As discussed above, the curbside blue parking space that Plaintiff requested would allow her to more easily access and therefore benefit from on-street parking, which in turn would allow her to come and go from her apartment with significantly less difficulty, risk, pain, and inconvenience compared to her current situation and compared to what persons without a disability experience.  The blue curb parking space is therefore "necessary" within the meaning of the ADA and RA.

### 4. Plaintiff is Not Seeking a Parking Space for Her Exclusive Use.

The City also justifies its denial on the ground that Plaintiff is asking "the City

---

[14] Plaintiff's counsel stated at oral argument that the reason Plaintiff asked for the blue curb space after living in Torrance for several years is that her condition changed: she broke her foot in 2012 and walking became more difficult.  She requested the blue curb space shortly thereafter.  *See* MSJ Tr. 9:21-10:9.

Exhibit A, page 36

1  to provide a parking space that is reserved for Plaintiff's exclusive use."  *See* Opp'n

2  3:11-12.  This straw man argument plainly mischaracterizes Plaintiff's request, which

3  is simply that the City designate a blue curb parking space in front of her apartment.

4  Plaintiff does not seek an exclusive space for her personal use, and indeed has

5  acknowledged that other disabled persons may well end up parking in that space.  *See,*

6  *e.g.*, Bassilios Depo. (Elliot Exh. 5:146:220147: ) ("Q: Did you request the space so

7  that it would be your own personal parking space or could be used by any person that

8  holds a disabled parking placard?  A: I understand that anyone with a placard would

9  be able to use it.").[15]

### F.   Plaintiff is Entitled to Judgment on her Claim Under Cal. Gov. Code § 11135.

12      As relevant to this case, California Government Code § 11135 prohibits

13  denying persons with a disability "full and equal access to the benefits of, or be

14  unlawfully subjected to discrimination under, any program or activity that is

15  conducted, operated, or administered by the state or by any state agency, is funded

16  directly by the state, or receives any financial assistance from the state."  Cal. Gov.

17  Code §11135(a).   Section 11135 "is identical to the Rehabilitation Act except that the

18  entity must receive State financial assistance rather than Federal financial assistance."

19  *Y.G. v. Riverside Unified Sch. Dist.*, 774 F. Supp. 2d 1055, 1065 (C.D. Cal. 2011);

20  *D.K. ex rel. G.M. v. Solano County Office of Educ.*, 667 F. Supp.2d 1184, 1191 (E.D.

21  Cal. 2009).  Section 11135 is also coextensive with the ADA because it incorporates

22  the protections and prohibitions of the ADA and its implementing regulations.  *See*

23  Cal. Gov. Code § 11135(b) (so stating).  Thus, if a public entity that receives state

24  funding has violated the RA or the ADA, then it has also violated § 11135.  Here, it is

25  undisputed that the City receives state funding, and as discussed herein, the City has

---

27  [15]  Even though other disabled persons could use the blue curb space, it stands to reason that it would be available to Plaintiff far more often than the green curb space

28  is because only persons with disabilities can use the blue curb space.

violated the RA and the ADA.  Therefore, the City has also violated § 11135.

**IV.   CONCLUSION**

In light of the undisputed material facts, the Court finds that parallel parking in the City is a program, service, or activity subject to Title II of the ADA and Section 504 of the RA, and that the City has denied Plaintiff reasonable access to its parking program.  Installing a blue curb parking space in front of Plaintiff's apartment building is a reasonable modification that would provide her access to the City's parking program, and it would neither impose an undue burden on the City nor require the City to alter its existing program.  The parties did not address whether placing a blue curb space at that exact location is the only modification that would satisfy the City's obligation, so the Court will not reach that issue.

Accordingly, Plaintiff's motion for partial summary judgment (Dkt. No. 41) is **GRANTED** as to the City's liability under Plaintiff's First, Second, and Third Claims for relief.

The City's motion for summary judgment is **DENIED**.

Dated:  December 4, 2015

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

35.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KATIE BASSILIOS,

           Plaintiff,

v.

CITY OF TORRANCE, CA

           Defendants.

Case No. CV 14-03059-AB (JEMx)

**ORDER RE: PERMANENT INJUNCTION**

On December 4, 2015, the Court issued an Order granting Plaintiff Katie Bassilios's ("Plaintiff") motion for partial summary judgment, finding that the City of Torrance ("City") violated Title II of the Americans with Disabilities Act (the "ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and California Government Code §11135 when it denied her request for a designated handicapped parking space on the street in front of her apartment.

Now before the Court is Plaintiff's Motion for Injunctive Relief. (Dkt. No. 126.) The City filed an Opposition and Plaintiff filed a Reply. The Court heard oral argument on January 19, 2016. After full consideration of the admissible evidence, the moving and opposing papers, the authorities submitted by counsel, the December 4 Order, and counsel's oral argument, the Court **GRANTS IN PART AND DENIES**

Exhibit B, page 39

**IN PART THE MOTION**, as follows.

        **IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

      1.     Within thirty (30) days from the date of this Order and Injunction, the City is ordered to install an on-street parking space designated for people with disabilities, and consistent with California Vehicle Code Section 22511.7(a) and Torrance Municipal Code Section 61.6.15(e), by painting the curb blue and installing the sign required by California Vehicle Code Section 22511.7(b) (referred to herein as a "Blue Curb Space") in the public right-of-way in front of the apartment building located at 321 Calle Miramar.  This deadline may be extended for good cause, including but not limited to inclement weather or the unavailability of personnel or equipment.

      2.     The City may remove the Blue Curb Parking Space (including the Blue Curb Parking Space described in Paragraph 1) if the person who requested it no longer needs it (e.g., because he or she has moved) or is no longer qualified to use it (e.g., because his or her disability was temporary).  This Order and Injunction does not preclude the City from adopting a policy or procedure to determine whether Blue Curb Parking Spaces are needed, such as requiring persons who requested the accommodation to periodically renew their requests.

      3.     If the City denies a request for a Blue Curb Parking Space, it shall comply with the requirements of 28 C.F.R. § 35.150(a)(3), as that regulation is amended from time to time or replaced with a successor regulation.

      4.     If it has not done so already, within thirty (30) days from the date of this Order and Injunction, the City is ordered to comply with 28 C.F.R. § 35.107(a), and 45 C.F.R. § 84.7(a), as those regulations are amended from time to time or replaced with successor regulations.  These regulations generally require certain public entities to designate a "responsible employee" to coordinate the public entity's efforts to comply with and carry out its responsibilities under the ADA and Section 504.  The City's "responsible employee" shall be trained in the ADA, Section 504, and state

laws relating to disability rights, including the City's obligations with respect to requests for parking accommodations, sufficient to fulfill the duties of that position, within thirty (30) days of being appointed. The thirty day deadline may be extended for good cause.

5. If it has not done so already, within six months from the date of this Order and Injunction, the City is ordered to comply with 28 C.F.R. § 35.107(b), and 45 C.F.R. § 84.7(b), as those regulations are amended from time to time or replaced with successor regulations. These regulations generally require certain public entities to adopt a "grievance procedure" that provides for the prompt and equitable resolution of complaints alleging any action prohibited by the ADA and Section 504.

6. The City is further ordered to take all actions necessary within the scope of its authority to implement the above injunction.

IT IS FURTHER ORDERED that this injunction will remain in full force and effect until the final judgment of this Court upon the trial of this action, or further order of this Court, whichever comes soonest. It is the intent of this Court that this injunction will be incorporated into the final Judgment of this Case following determination of Plaintiff's claim for damages. The Court shall retain jurisdiction of the injunctive provisions of this case for five (5) years, to determine any disputes about implementation.

IT IS SO ORDERED AND DECREED.


Dated: January 22, 2016      _____
                             HONORABLE ANDRÉ BIROTTE JR.
                             UNITED STATES DISTRICT COURT JUDGE

3.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - TRIAL

| | | | |
|---|---|---|---|
| Case No. | CV 14-03059-AB (JEMx) | Date | January 28, 2016 |
| Title: | Katie Bassilios v. City of Torrance, CA | | |

Present: The Honorable     **ANDRÉ BIROTTE JR.**

| Ingrid Valdes | Chia Mei Jui |
|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendants: |
|---|---|
| Dara L. Schur, Autumn M. Elliott | Alisha A. Patterson, Douglas J. Dennington |

Day Court Trial     3rd     Day Jury Trial

One day trial:   Begun (1st day);   Held & Continued;   _X_   Completed by jury verdict/submitted to court.

    The Jury is impaneled and sworn.

    Opening statements made by

    Witnesses called, sworn and testified.    Exhibits Identified    Exhibits admitted.

    Plaintiff(s) rest.    Defendant(s) rest.

✓ Closing arguments made by   ✓ plaintiff(s)   ✓ defendant(s).   ✓ Court instructs jury.

✓ Bailiff(s) sworn.   ✓ Jury retires to deliberate.    Jury resumes deliberations.

✓ Jury Verdict in favor of   plaintiff(s)   ✓ defendant(s) is read and filed.

✓ Jury polled.    Polling waived.

✓ Filed Witness & Exhibit Lists   ✓ Filed jury notes.   ✓ Filed jury instructions.

    Judgment by Court for   plaintiff(s)   defendant(s).

    Findings, Conclusions of Law & Judgment to be prepared by   plaintiff(s)   defendant(s).

    Case submitted.    Briefs to be filed by

    Motion to dismiss by    is   granted.   denied.   submitted.

    Motion for mistrial by    is   granted.   denied.   submitted.

✓ Motion for Judgment/Directed Verdict by Plaintiff & Defendant is   granted.   ✓ denied.   submitted.

    Settlement reached and placed on the record.

✓ Clerk reviewed admitted exhibits with counsel to be submitted to the Jury/Court for deliberation/findings.

    Counsel stipulate to the return of exhibits upon the conclusion of trial. Exhibit Release Form prepared and filed.

    Trial subpoenaed documents returned to subpoenaing party.

    Case continued to    for further trial/further jury deliberation.

    Other:

                                 3   :   14

Initials of Deputy Clerk     IV

cc:

Exhibit C, page 42

FILED
CLERK, U.S. DISTRICT COURT

JAN 28 2016

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KATIE BASSILIOS,

              Plaintiff,

v.

CITY OF TORRANCE, CA

              Defendants.

Case No. CV 14-03059-AB (JEMx)

**SPECIAL VERDICT FORM**

Exhibit D, page 43

We, the jury, answer the Questions submitted to us as follows:

## **DELIBERATE INDIFFERENCE**

1.    Did Ms. Bassilios prove by a preponderance of the evidence that she identified a specific, reasonable, and necessary accommodation that the City failed to provide, and that she notified the City of the need for that accommodation?

       _X_ YES    ___ NO

2.    Did Ms. Bassilios prove by a preponderance of the evidence that the City deliberately failed to fulfill its duty to act in response to her request for accommodation?

       ___ YES    _X_ NO

- If you answered YES to <u>both</u> questions 1 or 2, proceed to question 3.
- If you answered NO to <u>either</u> question 1 or 2, do not answer the remaining question. Sign and date the verdict form and notify the Bailiff.

//
//
//
//
//
//
//
//

2.

1  **DAMAGES**

2

3      3.     What amount of money do you find will reasonably and fairly

4  compensate Ms. Bassilios for any harm you find was caused by the City?   If you find

5  that Ms. Bassilios did not prove her damages by a preponderance of the evidence, you

6  must award nominal damages of $1.

7          $_____

8

9

10  Please date, sign, and return this Special Verdict Form to the Bailiff.

11

12      I hereby certify that this verdict is unanimous.

13

14

15      Dated: _1 – 28 –____, 2016

16

17      Signed: _____REDACTED_____   _____

18         Presiding Juror (Foreperson)

19

20

21

22

23

24

25

26

27

28

Exhibit D, page 45